CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
MAY 2 3 2007
JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DONELLA F. MILLS,<br>　　　Plaintiff, | )<br>)<br>) |
| v. | ) Civil Action No. 7:06cv00430<br>) |
| JO ANNE B. BARNHART,<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>　　　Defendant. | )　By:　Hon. Michael F. Urbanski<br>)　　　United States Magistrate Judge<br>)<br>)<br>) |

## MEMORANDUM OPINION

Plaintiff Donella F. Mills ("Mills") filed this action challenging the Commissioner of Social Security's final decision denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 401-433. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge, see 28 U.S.C. § 636(c)(2), and the case is before the court on cross motions for summary judgment. Having reviewed the record, and after briefing and oral argument, the court concludes that there is substantial evidence to support the Commissioner's determination that Mills was not disabled as of the last date insured and, therefore, is not entitled to benefits. Therefore, the Administrative Law Judge's ("ALJ") decision is affirmed.

### I.

Mills was born on March 28, 1967, and she received her GED in 1995. (Administrative Record [hereinafter R.] at 66) Mills' former employment includes that of a housekeeper, a receptionist, and a sales clerk. (R. 75, 84-89, 469-470) The parties agree that the last day on which Mill was insured for purposes of DIB was December 31, 2002, and thus, to be eligible for

benefits, she must prove she was disabled as of that date. 42 C.F.R. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.131(a); Johnson v. Barnhart, 434 F.3d 650, 655-56 (4th Cir. 2005).

Mills filed an application for benefits on or about March 19, 2004, alleging that she became disabled on December 28, 2002, due to fibromyalgia and chronic fatigue syndrome. (R. 74) The claim was denied initially and upon reconsideration, and a request for a hearing was filed. (R. 44) The hearing was held on March 27, 2006, (R. 430-483), and on April 20, 2006, the ALJ issued a written opinion denying Mills' claim for benefits. (R. 16-26) The ALJ determined that although Mills suffered from fibromyalgia and a depressive disorder as of the date she was last insured, she was not disabled as of December 31, 2002 and, instead, was able to do a range of work at the light exertional level.[1] (R. 23-24) This decision became final for the purpose of judicial review under 42 U.S.C. § 405(g) on June 29, 2006, when the Appeals Council denied Mills' request for review. (R. 8-10) Mills then filed this action challenging the Commissioner's decision.

## II.

Mills argues that the ALJ erred in failing to give controlling weight to Mills' treating psychologist's opinion and in failing to properly evaluate Mills' complaints of pain. Accordingly, she asks that the Commissioner's decision be reversed.

---

[1] Light work requires exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.
http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

Judicial review of a final decision regarding disability benefits under the Act is limited to determining whether the ALJ's findings "are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing 42 U.S.C. § 405(g)). Accordingly, the reviewing court may not substitute its judgment for that of the ALJ, but instead must defer to the ALJ's determinations if they are supported by substantial evidence. Id. Substantial evidence is such relevant evidence which, when considering the record as a whole, might be deemed adequate to support a conclusion by a reasonable mind. Richardson v. Perales, 402 U.S. 389, 401 (1971). If such substantial evidence exists, the final decision of the Commissioner must be affirmed. Hays, 907 F.2d at 1456; Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

## III.

Mills argues that the ALJ failed to afford appropriate weight to her treating psychologist's October 2005 mental residual functional capacity evaluation. In support of her argument, Mill contends that she began seeing Lola Byrd, Psych.D., in March 2002, and therefore, Dr. Byrd would be the best positioned to evaluate Mills' mental condition. In Dr. Byrd's October 2005 evaluation, she found that Mills suffers from major depression as of the date last insured, December 31, 2002. (R. 406) She also determined that Mills suffers from pain which is so severe, at times it causes her to be incapacitated and it causes her to have sleep and rest problems which, in turn, cause her to have attention and concentration problems. (R. 403-06) Mills argues that this opinion should be construed to establish that Mills suffered from severe depression as of December 31, 2002, precluding all forms of employment.

3

Absent persuasive contradictory evidence, the "treating physician rule" generally "requires that the fact-finder give greater deference to the expert judgment of a physician who has observed the patient's medical condition over a prolonged period of time." Elliott v. Sara Lee Corp., 190 F.3d 601, 607 (4th Cir. 1999). However, a treating physician's opinion may be assigned little or no weight if it is conclusory and/or is not supported by objective testing or the record as a whole. Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). The ALJ did not disregard Dr. Byrd's 2005 assessment; however, she noted that this opinion was not entitled to controlling weight because it was inconsistent with the record and was not reflective of those symptoms which were actually present as of December 31, 2002, the date last insured. (R. 18-25)

In March 2002, Mills first sought treatment from Dr. Blaylock for fibromyalgia symptoms and fatigue. (R. 190-91) At that time she noted she had only transient feelings of depression, she did not have any anxiety or nervousness, she felt minimal stress, and she had no difficulty falling asleep, but had difficulty staying asleep. (R. 190) Dr. Blaylock referred Mills to Dr. Byrd for further evaluation and treatment. (R. 191)

During the initial evaluation in March 2002, Dr. Byrd noted that Mills had a pleasant affect, she was rational and coherent, and she had excellent insight into her medical problems. (R. 248, 377) Although Dr. Byrd determined that Mills suffered from a depressive disorder, she found that Mills had a GAF score of 56[2] and any psychotherapy should focus on Mills learning to adapt to her medical conditions, to relax, and to establish boundaries with her in-laws. (R. 250,

---

[2] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic And Statistical Manual Of Mental Disorders Fourth Edition 32 (American Psychiatric Association 1994). A GAF of 51-60 indicates than an individual has "[m]oderate symptoms . . . OR moderate difficulty in social, occupational or school functioning . . ." Id.

379) Dr. Byrd saw Mills three times in April 2002. Although in each visit Dr. Byrd noted that Mills appeared to be fatigued, the focus of each session was the development of appropriate boundaries with Mills' in-laws and there was no mention of debilitating depression. (R. 244-46, 382-84) Similarly, in Mills' two sessions in the summer of 2002, each visit focused on familial boundaries. (R. 242-43, 384-85) Mills returned to Dr. Byrd in December 2002, and at that time, Dr. Byrd noted that Mills was making daily living adjustments to adapt to fibromyalgia, that she was receiving emotional support from her husband, and that she had begun to set appropriate boundaries with her in-laws. (R. 241, 386) Again, Dr. Byrd did not note any symptoms of debilitating depression, fatigue, and/or memory problems. (R. 241, 386)

In January 2003, Dr. Byrd noted that Mills presented with mild dysphoria[3], due to some trouble adapting to necessary lifestyle changes; however, he also noted that she was currently on a weight loss program to help manage her symptoms. The treatment notes do not mention any problems with memory, concentration, or fatigue, and the session focused on her childhood abuse and childhood anxiety. (R. 240, 387) Mills did not return to Dr. Byrd until June 2003. At that time he noted Mills had a good attitude and she had lost thirty five pounds, but that she had dark circles under her eyes. (R. 239, 288) Once again, the session focused on Mills' childhood abuse. (R. 239, 288)

Mills returned to Dr. Byrd more than six months later, in January 2004. Dr. Byrd's very brief notes state that Mills had a depressed affect and was having some trouble dealing with her fibromyalgia symptoms because the lifestyle changes caused her to be bored. (R. 238, 389)

---

[3]Dysphoria is disquiet, restlessness, and/or malaise. <u>Dorland's Illustrated Medical Dictionary</u> 577 (30th ed. 2003).

5

However, he did not indicate a need for ongoing or regular therapy; rather, he stated she needed only cognitive support on a periodic adjustment basis. (R. 238, 389) Mills returned in June 2004, and Dr. Byrd noted that she appeared to be in "excruciating pain" and had dark circles under her eyes. (R. 237) However, there is no mention of any depression or mental symptoms, and the session appeared to be limited to Dr. Byrd advising Mills to see a physiatrist and to establish a primary care physician. (R. 237) Mills returned in September 2004, and at that time, she complained that she was upset because she could not work and could not get much done around her home. (R. 236) For the first time, Dr. Byrd noted that Mills needed therapy on a consistent basis to help her deal with depression. (R. 236) For the next four months, Mills began to see Dr. Byrd on a more regular basis. During those sessions, Dr. Byrd noted that Mills appeared to be fatigued and in pain and also seemed to exhibit some concentration problems. (R. 231-35, 414-15) However, in December 2004 and January 2005, Dr. Byrd noted that Mills was functioning on a fair level. (R. 414-15) Thereafter, she did not return to Dr. Byrd until November 2005. At that time, Dr. Byrd noted that although Mills continued to appear to be in pain and with dark circles under her eyes, he found she still functioned at a fair level and needed only supportive and directive therapy. (R. 417)

In his initial interview with Mills in March 2002, Dr. Blaylock noted that Mills reported only transient depression. (R. 190) Similarly, in August 2002, Mills reported to Dr. Laura Liles that she suffered only mild depression. (R. 138) There is no other mention of Mills' depression in her treating physicians' notes until June 2003, when Dr. Pang noted that Mills had a "significant problem with depression and insomnia." (R. 182) In August 2003, Dr. Pang noted Mills' affect had improved, (R. 175), and in September 2003 he reported her affect was normal.

6

(R.169) Further, although Mills' treating physicians' records routinely note she has been diagnosed with depression, there are minimal indications in those records suggesting that her depression actually affected her functional abilities. For instance, in March 2004, Mills reported that she was not having crying spells and was managing herself "quite well," (R 151), in September 2004 she advised her physical therapist she had less emotional instability, (R. 226), in December 2004 she reported to another treating physician that she had no psychiatric complaints, (R. 267), and in January 2006, her primary care physician noted "[h]er mental health was good." (R. 421)

Although Mills' medical record establishes that she suffered from depression from as early as March 2002, the record plainly reflects that her symptoms were not debilitating as of December 31, 2002, the date last insured. Prior to that date, the record does not support a finding that Mills' depression was causing substantial functional limitations. Although Mills complained of some concentration and memory problems, Mills did not complain to any of her treating physicians that her depression impacted her daily living and/or social activities. Mills' treating psychologist, Dr. Byrd, repeatedly found she needed minimal amounts of supportive counseling, and the actual counseling Mills received was sporadic at best and centered on forming appropriate boundaries with family members. Nonetheless, by as early as August 2003, Mills' treating physicians reported that her depression had largely resolved.

To the extent Dr. Byrd's October 2005 evaluation can be construed to be an opinion that Mills was disabled from all forms of work as of December 31, 2002, it is unpersuasive. Opinions that a claimant is "unable to work" are not entitled to controlling weight because such decisions are reserved for the Commissioner. 20 C.F.R. § 404.1527 (e)(1) (stating a medical

7

expert's opinion as to the ultimate conclusion of disability is not dispositive); Morgan v. Barnhart, 142 Fed.Appx. 716, 722 (4th Cir. 2005) (holding that a treating physician's opinion that claimant was "disabled," "unable to work," could not work an eight hour job, and/or could not do her previous work was not entitled to controlling weight). Moreover, as noted above, such a finding in this case is inconsistent with Mills' contemporaneous medical records and was done nearly three years after the date last insured. As such, it is not entitled to great weight. See Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) (finding that a treating physician's opinion may be assigned little or no weight if it is conclusory and/or is not supported by objective testing or the record as a whole). This opinion is particularly suspect as Dr. Byrd stated therein that the mental impairments he found had existed and persisted to the same degree noted since at least 2000, more than two years before he began treating Mills. Also noteworthy, during the period in which Dr. Byrd asserts that Mills' suffered from major depression precluding all forms of gainful employment, Dr. Byrd did not find Mills needed regular counseling, Mills maintained regular part-time employment, and Mills reported to various physicians that she suffered only mild symptoms of depression. Accordingly, the court finds the ALJ properly afforded this opinion little weight.

## IV.

Mills also argues that the ALJ improperly evaluated her complaints of disabling pain. Mills testified that her pain is so severe she can only sit for about 45 minutes before needing to stretch, stand, and move around and at least three days a week she needs to lie down during the day to relive her pain and fatigue. (R. 475-76) She also testified her pain and fatigue cause her to have problems with her memory and concentration. (R. 477)

The ALJ considered Mills' testimony in conjunction with the record as a whole in determining that her statements of disabling pain in 2002 were not wholly credible and that, as of the date last insured, she retained the residual functional capacity to do some light work. (R. 405-13) In light of conflicting evidence in the record, it is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and her ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Accordingly, the ALJ is not required to accept Mills' subjective allegation that she was disabled by pain and exhaustion as of December 31, 2002, but rather must determine, through an examination of the objective medical record, whether she has proven an underlying impairment that could have been reasonably expected to produce the symptoms alleged. Craig v. Chater, 76 F.3d 585, 592-93 (4th Cir. 1996) (stating the objective medical evidence must corroborate "not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers."). Then, the ALJ must determine whether Mills' statements about her symptoms are credible in light of the entire record. Credibility determinations are in the province of the ALJ, and courts normally ought not interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989).

The medical records establish that although Mills may now be disabled from all forms of gainful employment due to chronic pain and fatigue, she was not disabled as of December 31, 2002. Mills first began seeing Dr. Blaylock in March 2002, following complaints of chronic pain and fatigue related to fibromyalgia. (R. 190-92) Dr. Blaylock advised her to begin walking, to do at least thirty minutes of exercise each day, and to do stretching exercises daily, and he referred her to physical therapy. (R. 192) In June 2002, after only six physical therapy sessions,

9

Wendy Lucas, PT, noted that Mills had responded well to physical therapy and her only remaining complaints were of pain in her right side radiating around her trunk. (R. 128)

In August 2002, Mills returned to Dr. Blaylock, and although she continued to complain of pain in her muscles and ribs, she reported she was walking regularly, stretching twice a day, and that she had lost fourteen pounds with a combination of diet and exercise. (R. 189) She also reported that she was only taking her prescribed pain reliever once a day, at night, not four times a day as prescribed, and that she was sleeping better. (R. 189) Likewise, in August 2002, she reported to Dr. Liles that her pain was being controlled with medication, she was still working part-time in a clothing store, she was on her feet constantly, she was walking on a regular basis, and she was using a "glider" at home. Additionally, she reported that she was gardening and attending church regularly. (R. 138) Dr. Liles recommended additional stretching exercises and that Mills begin a weight training program. (R. 139) In December 2002, Dr. Blaylock noted that although Mills still complained of pain, she reported she was feeling better, she was continuing to exercise, and she had lost a total of twenty-five pounds. (R. 187)

Mills did not return to any of her physicians until June 2003, and at that time she reported that she was sore all over and had quit her job at the clothing store. (R. 185) She also noted that she was only walking twice a week, she was not sleeping well, and she was taking her pain medication much more frequently. (R. 185, 194) To combat her discomfort, Dr. Blaylock again recommended that Mills stretch twice a day and he referred her to a rehabilitation specialist, Dr. Pang. (R. 186, 195) During her initial evaluation with Dr. Pang in June 2003, Mills reported that she was suffering from severe pain and was having trouble sleeping. (R. 181) Dr. Pang noted that Mills was is no acute distress, she walked with a normal gait, she was able to get up

10

and down from the chair and examining table without assistance, she was able to dress and undress without assistance, and she had a normal range of movement. (R. 182) However, he also noted that she had localized tenderness and pinpoint tenderness. (R. 182-83) Dr. Pang again stressed the importance of Mills doing regular exercise to control her discomfort and he suggested to her that she may benefit from water exercise. (R. 183) Dr. Pang also referred Mills to an outpatient fibromyalgia rehabilitation program. (R. 183)

Mills returned to Dr. Blaylock in July 2003, and she reported that she was feeling better, was having less fatigue, and that the prescribed pain medication was controlling her pain. (R. 178) He advised her to continue to stretch and exercise daily and to participate in the physical therapy program set up by Dr. Pang. (R. 178) Mills completed the physical therapy program in August 2003, and the discharge note states that Mills met most of the treatment goals, her pain had decreased, and she had increased the amount of exercise she did. (R. 140) Likewise, Mills reported to Dr. Pang in August 2003 that the physical therapy and pain medication had helped to control her pain, and on exam, he found she was doing better overall. (R. 175-76)

In September 2003, although Mills continued to complain of pain, she reported to Dr. Pang that she had just returned from a trip with her husband to Montreal, Canada where she did a lot of walking without any difficulty, but that she needed a day to rest after the trip. (R. 169) Similarly, in December 2003, despite ongoing complaints of pain, Mills reported that she had just returned from a trip to Florida to visit her mother who after her surgery. (R. 160)

Mills saw Dr. Blaylock twice in 2004, about once every six months. During each visit Dr. Blaylock encouraged Mills to do more exercise and at least thirty minutes of walking every day. (R. 147, 156) Mills only saw Dr. Pang once in 2004, and during that visit Dr. Pang noted

11

that Mills was sleeping better, she had no new symptoms, her straight leg test was negative, she continued to have normal muscle strength and sensation, and she continued to be able to ambulate and move up and down without assistance. (R. 151)

In August 2004, Mills began rehabilitation at Valley Rehabilitation. In the initial evaluation, Dr. Mowery noted that Mills complained of chronic, aching pain and stiffness. (R. 228) However, by September 2004, Mills reported she was "quite pleased" with her progress, her pain had decreased to five-out-of-ten, and her sleep had improved. (R. 226) Likewise, in November 2004, Mills reported her pain had further decreased. (R. 225) Thereafter, Dr. Mowery found that Mills need not continue in a formal physical therapy program, but should begin a home exercise program. (R. 225) During a recheck in December 2004, Mills reported her pain had increased, but she also noted that she had not been doing her exercises or getting adequate amounts of rest because she had been hospitalized for dehydration following a bout with the flu. (R. 396) Thereafter, Mills complained of increased pain despite doing her home exercises and walking for about thirty minutes a day. (R. 391-94, 410-11)

Mills argues that her psychologist, Dr. Byrd's, treatment notes from 2002 which state, in various form, that Mills appears to be suffering from extreme pain and fatigue and that she has large, dark circles under her eyes demonstrate that Mills was suffering from debilitating pain and fatigue before the date last insured. (R. 377, 383, 384) The record as a whole simply does not indicate that Mills was totally disabled from all substantial gainful activity as of December 31, 2002, the last date she was insured. Although Mills' medical records establish that she complained of pain and fatigue secondary to fibromyalgia in 2002, it is clear these symptoms were not wholly disabling as of the date last insured. Mills' medical records indicate that

12

throughout 2002 and as late as December 2004, her symptoms were managed with minimal amounts of medication, physical therapy, and exercise. None of her physicians advised her to stop all forms of physical activity. In fact, quite the opposite is true, as all advised her to substantially increase the amount of exercise she did. Further, during this period, the record clearly establishes that Mills was traveling and was engaging in regular and substantial amounts of exercise including walking, stretching, and weight lifting.

Further, Mills reported daily activities also indicate that she was not wholly disabled by pain and fatigue as of the date last insured. During the administrative hearing Mills testified that she goes out to eat frequently, she exercises and does stretching exercises daily, she cleans her home regularly, she enjoys reading, and she goes to church three times a week for two hour meetings. (R. 458-461) In her daily activities questionnaire completed in April 2004, Mills reported that she makes three to four trips outside her home weekly to go grocery shopping, run errands, and go to doctor appointments; she goes to church three times a week; and she visits with family once a week and with friends once or twice a month. (R. 94-97) She also indicated that she has no problem caring for herself; she prepares her own meals and she cooks regularly; she maintains her household including, doing laundry and cleaning and dusting her home; and she reads and watches television. (R. 94-98)

The ALJ did not discount Mills' testimony that she was currently experiencing limitations in her functional abilities due to chronic pain and fatigue. However, she found that Mills' testimony regarding the extent of her limitations on December 31, 2002, the date last insured, were not credible based on her medical record and her admitted functional abilities at the time she filed her disability application. (R. 24) Considering the entire record, especially the

13

information contained in Mills' medical record, there is no reason to disturb the ALJ's credibility determination. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). Further, based on a complete review of Mills' medical history and her admitted functional abilities on her disability application, the court finds there is substantial evidence to support the ALJ's determination that as of December 31, 2002, the date last insured, Mills retained the physical capacity for a some range of light exertional work. See Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) (upholding finding of no disability where plaintiff testified that she suffers from severe pain and hand problems where plaintiff was able to attend Church twice a week, read books, watch television, clean the house, wash clothes, visit relatives, feed pets, manage household finances, and perform exercises recommended by her chiropractor); Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (upholding a finding of no disability where plaintiff was able to cook, shop, wash dishes, and walk to town every day).

## V.

Accordingly, the decision of the Commissioner is affirmed, and defendant's motion for summary judgment is granted. In reaching this conclusion, the court does not suggest that plaintiff was, as of the date last insured, free of all pain and subjective discomfort. The objective medical record simply fails to document the existence of any condition which would reasonably be expected to have resulted in total disability for all forms of substantial gainful employment as of December 31, 2002. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating plaintiff's claim for benefits. It follows that all facets of the

14

Case 7:06-cv-00430-mfu   Document 18   Filed 05/23/07   Page 14 of 15   Pageid#: 80

Commissioner's decision in this case are supported by substantial evidence. Defendant's motion for summary judgment must be granted.

The Clerk of the Court hereby is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

ENTER: This 23rd day of May, 2007.

/s/ Michael F. Urbanski
Michael F. Urbanski
United States Magistrate Judge